IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| vs. | : | 1:18-cr-123-6 |
| | : | |
| HENRY ZELAYA-MARTINEZ, | : | |
| | : | |
| Defendant. | : | Honorable Rossie D. Alston |
| | : | |

**MOTION TO SUPPRESS STATEMENTS**

Comes now, Defendant, by counsel, and respectfully moves this Court to suppress his statements to Special Agent Fontanez obtained in violation of his Fifth Amendment right against self-incrimination and in violation of Miranda v. Arizona.

**RELEVANT FACTS**

On November 18, 2018, the Defendant was arrested by law enforcement at his mother's residence in Alexandria, Virginia. After the arrest, law enforcement transported the Defendant to an FBI facility in Washington, DC and placed him in an interrogation room. While alone in the interrogation room, Defendant yawned repeatedly and appeared to try to sleep, leaning his head against the wall and closing his eyes. When Special Agent Fontanez entered the room to begin his interrogation, his first question to Defendant was an incredulous, "Sleeping? What happened?" He then told Defendant that they would do this as quickly as possible, since he knew it was early on a Sunday. Special Agent Fontanez then continued to talk with the Defendant prior to advising the Defendant of his Miranda rights. The agent engaged in

1

conversational tactics designed to put Defendant at ease.  He pledged that he would call the Defendant's mother after the interview and let her know that he was in Alexandria.  The agent also mentioned that the Defendant's sister loved him and that the agents are people like the Defendant.

The agent then engaged in explicit pre-Miranda questioning of the Defendant.  While some of the questions elicited standard information necessary for booking such as the Defendant's name, age, and date of birth, the agent also asked a number of investigatory questions prior to the administration of the Defendant's Miranda rights.  Some of these questions obviously had the potential to lead to incriminating answers.  For example, the agent asked the Defendant when he had come to the United States from El Salvador and followed up by asking how he had crossed the border.  The agent asked for the complete names of Defendant's immediate family members, one of whom is a co-defendant in this case, what he did for work, how he did his roofing work, how long he had worked in roofing, how long he had been in Alexandria, when he arrived at his mother's house in Alexandria, where he had come from (Michigan), who he has staying with in Michigan, whether he had a "gatita"[1] in Michigan, whether he was working in Michigan, and if he had come to visit his mother in Alexandria for Thanksgiving.  Prior to administering the Miranda warnings, the agent also asked what the number was to the Defendant's cellular phone (which the Defendant did not know), the type of phone, and if the Defendant had bought the phone.

Some of Defendant's answers to these initial questions demonstrated confusion and a lack of clear thinking.  When asked his date of birth, Defendant responded "1993."  Special Agent

---

[1] In Spanish, the word means female kitten—an apparent reference to a girlfriend.

2

Fontanez then poked fun at Defendant for seeming to not know his birthday.  Defendant then responded "November 29" while laughing uncomfortably.  When asked how old he was, even after being reminded he had previously said he was 24 years old, Defendant responded, "I think 24, like 24 or 25."  Defendant appeared embarrassed when telling the agent he did not speak English.  This question was immediately followed by the agent saying "But you can read and write Spanish?"  Defendant hesitated slightly before answering "Yes."  When questioned about his level of education, Defendant stated that the highest grade he attended in school was 9th grade in El Salvador.  When asked his mother's full name, Defendant had difficulty providing her last names.  Again, Special Agent Fontanez made fun of Defendant for this failure saying "What's going on, you don't know your mother's name?"  When asked his father's name, Defendant looked up at the ceiling, paused, and said "Jose Romeo or something like that."  He also did not know the phone number of his own cell phone.[2]

    When introducing the <u>Miranda</u> rights, Special Agent Fontanez told Defendant that this was a federal arrest and that there were things they wanted to talk to him about.  He did not tell him the nature or seriousness of the charges.  Defendant stated that he had never before been arrested in the United States.  Special Agent Fontanez read Defendant his <u>Miranda</u> rights very quickly, without pausing after each individual right to ask Defendant if he understood.  The agent asked Defendant at the end if he had understood, and signed the form himself.  He asked Defendant to read the consent at the bottom of the form, but did not read it aloud or ask Defendant to read it aloud to ensure that he was, in fact, able to read it.  The agent then told

---

[2] Defendant also showed cognitive limitations in other portions of the recorded police interview.  Defendant did not know his mother's phone number, despite her having had the same number for years.  When the agents obtained his mother's phone number from his cell phone and suggested he needed to memorize it, Defendant appeared unsure.  Recognizing his discomfort with the idea of memorizing the number, the agent wrote it out on a small slip of paper for him.

defendant, "your signature, see where it says 'signature'?" while handing Defendant the pen. Defendant signed the advice of rights form. The agent then commented on how messy and illegible Defendant's signature was, suggesting that it was like a signature of a lawyer or doctor. Defendant laughed and agreed with the officer, making a scribbling motion in the air.

Preliminary psychological evaluations conducted during this representation establish that Defendant is intellectually impaired, with intellectual abilities in the lowest second to first percentile of the population as a whole. Defendant suffered brain damage as a result of early childhood injuries, and shows clinically significant impairment in attention, executive functions, fluency and memory. Defendant attended school in El Salvador until he was 20 years old, but only reached the 9th grade. He was still in 7th grade at 18 years of age. The psychological evaluations show Defendant has an impaired ability to problem solve and very significant memory deficits.

**ARGUMENT**

I. **The Pre-Miranda Interview Violated Defendant's Rights under <u>Miranda v. Arizona</u> and Must Be Suppressed**

In <u>Miranda v. Arizona</u>, the United States Supreme Court famously held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." <u>Miranda v. Arizona</u>, 384 U.S. 436, 444 (1966). Custodial interrogation was defined by the Court as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." <u>Id.</u> The Court further specified the procedural

safeguards required, stating that "[p]rior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." Id. It is, of course, well established that "[t]he Miranda Court formulated a warning that must be given to suspects **before** they can be subjected to custodial interrogation." Berghuis v. Thompkins, 560 U.S. 370, 380 (2010)(emphasis added).

In Pennsylvania v. Muniz, the Supreme Court created an exception to the Miranda requirement for "questions to secure the biographical data necessary to complete booking or pretrial services" which are "requested for record-keeping purposes only." Pennsylvania v. Muniz, 496 U.S. 582, 601 (1990). See also U.S. v. Taylor, 799 F.2d 126, 128 (4th Cir. 1986) ("the taking of basic personal information such as name, age, and place of birth is a ministerial duty incident to arrest and custody which does not constitute interrogation or its functional equivalent, reasonably likely to elicit an incriminating response.")

In this case, Special Agent Fontanez's pre-Miranda questioning of Defendant went well beyond the taking of "basic personal information." Special Agent Fontanez asked numerous questions, prior to advising Defendant of his Miranda rights, which had a clear investigatory purpose and which any law enforcement officer would know were "reasonably likely to elicit an incriminating response." Taylor, 799 F.2d. at 128 (quoting U.S. v. Morrow, 731 F.2d 233, 237 (4th Cir. 1984), which in turn had quoted Rhode Island v. Innis, 446 U.S. 291, 301-02 (1980)). In addition to his own personal information, Special Agent Fontanez asked Defendant for the personal information of all of his immediate relatives, including his brother who was a known co-defendant in this case. Special Agent Fontanez not only asked Defendant where he was born,

5

but when **and how** he had come to the United States. With respect to how he came to the United States, Special Agent Fontanez asked Defendant if he had come "walking" – a clear reference to a likely illegal entry to the United States. Any FBI Special Agent would certainly know that an answer to this question would likely elicit proof of a federal offense. In addition, before administering the Miranda warnings, Special Agent Fontanez asked Defendant questions about his cell phone including the phone number, what type of phone it was, and whether he had bought it himself or someone else had bought it for him. Again, these questions clearly serve an investigatory purpose and cannot be justified under the "booking questions" exception to Miranda.

Because Special Agent Fontanez's pre-Miranda questioning far exceeded the routine personal information that can be requested for "booking" purposes and instead sought information relevant to the criminal investigation and included questions likely to elicit incriminating information, the pre-Miranda portion of the interrogation must be suppressed.

## II. Defendant's Miranda Waiver Was Not Knowing, Intelligent and Voluntary and His Statement Must Be Suppressed

It is well established that "[a] statement is not 'compelled' within the meaning of the Fifth Amendment if an individual 'voluntarily, knowingly and intelligently' waives his constitutional privilege." Colorado v. Spring, 479 U.S. 564, 573 (1987)(quoting Miranda v. Arizona, 384 U.S. at 444). There are two distinct parts to the inquiry into whether a particular suspect voluntarily, knowingly and intelligently waived his rights.

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned

> and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived.

Moran v. Burbine, 475 U.S. 412, 421 (1986). Therefore, even "[i]f the State establishes that a Miranda warning was given and the accused made an uncoerced statement, this showing, standing alone, is insufficient to demonstrate 'a valid waiver' of Miranda rights." Berghuis v. Thompkins, 560 U.S. 370, 384 (2010). Rather, "[t]he prosecution must make the additional showing **that the accused understood these rights**." Id. (emphasis added).

As explained in Moran v. Burbine, this understanding by the accused must encompass a "full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Moran v. Burbine, 475 U.S. at 421; See also U.S. v. Cristobal, 293 F.3d 134, 140 (4th Cir. 2002). With respect to this inquiry, "police overreaching (coercion) is not a prerequisite for finding that a waiver was not knowing and intelligently made." Cristobal, 293 F. 3d at 142. Rather the Court must assess each case individually, considering the totality of the circumstances, including "the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." North Carolina v. Butler, 441 U.S. 369, 374-75 (1979).

In Fare v. Michael C., 442 U.S. 707 (1979), the Supreme Court elaborated on the types of background and experience of the accused that would be relevant to this inquiry. In Fare, the Supreme Court considered whether a different standard than the one used for adult suspects should be applied to assessing whether a juvenile had waived his rights under Miranda. The Court concluded that there were "no persuasive reasons why any other approach is required

7

where the question is whether a juvenile has waived his rights, as opposed to whether an adult has done so." Id. at 725. The Court went on to elucidate the factors that the totality of the circumstances approach required the trial court to consider. "The totality approach permits—indeed, it mandates inquiry into all the circumstances surrounding the interrogation. This includes evaluation of the juvenile's age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights." Id. This Court must consider these same factors in this case when evaluating whether Defendant knowingly and intelligently waived his Miranda rights.

In this case, Defendant suffers from significant intellectual impairment (the extent of which is still being investigated). This impairment is evidenced by psychological testing and evaluation conducted thus far during the defense of this case, by his history of traumatic brain injury and brain impairment, especially in the area of memory, as a child, by his struggles to perform academically during his schooling, and by his statements and actions during the interrogation itself. Preliminary psychological evaluations conducted during this representation establish that Defendant has intellectual abilities in the lowest second to first percentile of the population as a whole and clinically significant impairment in attention, executive functions, fluency and memory. Defendant has an impaired ability to problem solve and very significant memory deficits. Defendant stayed in school until he was 20 years old and only made it to 9th grade. At 18 years old he was still a 7th grader.

As elicited by the agent during the interrogation, Defendant had never before been arrested in the United States and had no prior familiarity with the American legal process. He

was born and raised in El Salvador and never attended school in the United States. Therefore his baseline understanding of the rights of an arrestee or criminal defendant in the United States are well below what would be expected of a U.S.-educated young person who would have had lessons on U.S. history and civics in school, as well as access to cultural representations of accused persons' <u>Miranda</u> rights in action.

  Furthermore, Defendant's mental limitations are also evident during the interrogation. Despite being consistently cooperative and accommodating to the agents during the interrogation, Defendant is unable to tell them his own cell phone number and does not know his mother's phone number, which number she has had for at least 5 years. He does not know his mother's full name, nor his father's full name. He expresses doubt about his own age stating that is he "like 24 or 25" years old and doesn't know how old his youngest sister is. During the interrogation the agent pokes fun at Defendant for not knowing or being able to remember these basic facts about himself and his family.

  When Special Agent Fontanez reads Defendant his <u>Miranda</u> rights he does so extremely quickly. Defendant asks no clarifying questions. The agent does not ask Defendant to read the rights or consent paragraph aloud or otherwise assess his ability to read Spanish. The agent does not explain the <u>Miranda</u> rights or the consent in simple language. He directs Defendant to read the consent paragraph to himself and does not read it aloud to Defendant. When Defendant signs the form, the agent again pokes fun at Defendant for signing the "consent" with completely illegible scribble.

  From these facts, as well as those that will be presented at a hearing on this Motion, the Court must conclude that Defendant did not knowingly and intelligently waive his <u>Miranda</u>

rights "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." <u>Moran v. Burdine</u>, 475 U.S. 412, 421 (1986). His statement to Special Agent Fontanez must therefore be suppressed in its entirety.

## CONCLUSION

For the foregoing reasons, and those to be presented at a hearing on this Motion, the Defendant respectfully requests that the Court grant this motion and suppress Defendant's statement to Special Agent Fontanez because it was obtained in violation of Defendant's Fifth Amendment right against self-incrimination and the protections of <u>Miranda v. Arizona</u>. A proposed Order is attached hereto.

Respectfully submitted,

_____/s/_____
Emily Beckman
VSB# 70799
Joseph King
VSB # 65632
King, Campell & Poretz PLLC
108 N. Alfred Street, 2nd Floor
Alexandria, Virginia 22314
(703) 683-7070
Fax: (703) 652-6010
emily@kingcmapbell.com
jking@kingcampbell.com

_____ /s/_____
Charles Russell Twist
VSB# 35483
Charles Russell Twist, PLC
2111 Wilson Boulevard, Suite 700
Arlington, Virginia 22201
703-812-8686
charlesrussell.twist@verizon.net

CERTIFICATE OF SERVICE

      I hereby certify that a copy of the foregoing was filed via ECF and thereby forwarded to all counsel of record on this 18th day of November, 2019.

                                    _____/s/_____
                                    Joseph King
                                    VSB# 65632
                                    King, Campell & Poretz PLLC
                                    108 N. Alfred Street, 2nd Floor
                                    Alexandria, Virginia 22314
                                    (703) 683-7070
                                    Fax: (703) 652-6010
                                    jking@kingcampbell.com