**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **vs.** | : | **1:18-cr-123-6** |
| | : | |
| **HENRY ZELAYA-MARTINEZ,** | : | |
| | : | |
| **Defendant.** | : | **The Honorable Rossie D. Alston** |
| | : | |

**MOTION TO SUPPRESS ALL EVIDENCE**
**DERIVED FROM ILLEGAL ARREST OF DEFENDANT**

Comes now, Defendant, by counsel, and respectfully moves this Court to suppress all evidence flowing from his arrest, which he asserts was made in violation of the Fourth Amendment, to include his post-arrest statements to law enforcement and the seizure and subsequent search of his cellular phone.   In making this motion, Defendant further relies on all other rights safeguarded by the Fifth, Sixth and Eighth Amendments to the United States Constitution.

**RELEVANT FACTS**

1.    Woodbridge Raid

On November 18, 2018, an FBI SWAT team consisting of approximately 20 law enforcement officers conducted an "arrest operation" to take the Defendant into custody pursuant to a federal arrest warrant.  In the pre-dawn hours of that day, the team surrounded a residence in Woodbridge, Virginia.   Per a law enforcement report, surveillance indicated that a person matching the Defendant's description was visiting in the home.

1

At approximately 6:00 a.m., without obtaining a search warrant to enter the residence, agents used bashed open doors to the home and rushed in with guns drawn.  The law enforcement raid surprised and shocked the home's sixteen occupants, seven of whom were minor children.  For the occupants, the scene was chaotic and frightening.  Many residents had guns pointed at them as agents shouted commands and placed them in handcuffs.  Children were also handcuffed.  One resident recalls how law enforcement removed her and her children from the home, all handcuffed behind their backs, without coats or blankets into the cold morning air.[1]  She recalls being required to sit inside a law enforcement vehicle for a long period of time before being brought back inside.

After securing the residence, law enforcement then proceeded to specifically identify *everyone* in the home, even those who obviously did not match the description of the Defendant.  ICE deportation officers took two occupants into custody for apparent immigration violations.  The Defendant was not amongst the home's residents.   After perhaps two hours, law enforcement released the occupants and left instructions on how to make claims for damage caused by the SWAT team.

2.      Alexandria "Knock and Talk"

After failing to find the Defendant in the Woodbridge home, law enforcement officers proceeded to Alexandria, Virginia, to conduct a "knock and talk" at the home of the Defendant's mother, Ms. Martinez.   Law enforcement, on information and belief, had no specific information other than a hunch or guess that Defendant was in fact inside his mother's home, which is why a

---

[1] This resident reports that her children were traumatized and continue to deal with the after effects of the law enforcement raid on their home.

"knock and talk" was conducted—i.e. bereft of probable cause to enter the residence to execute

the arrest warrant, law enforcement needed to obtain "consensual" entry into the home to gather

evidence as to whether the Defendant was there.

Law enforcement began to arrive around Ms. Martinez's residence at approximately 7:00

a.m. Ms. Martinez then lived in a garden style apartment building in a ground floor unit. The

building's main entrance opened into a breezeway with mailboxes for the several apartments in-

side. The front door to each apartment inside the breezeway was labeled with an apartment

number and had a knocker. The mother's front door was located down a short flight of stairs

alongside another door.

The mother's ground floor residence also had a backdoor and a sliding glass door next to

it. The windows had floor to ceiling shades and the doors opened onto a small private patio with

chairs and surrounding green space. The back door, while labeled with an apartment number,

had no knocker. This back entrance was for the exclusive use of the apartment's residents—

packages were left at the front door within the breezeway and those with official business were

expected to come to the front door.

At approximately 7:30 a.m., law enforcement entered the apartment building's main en-

trance, descended the stairs, and utilized the front door knocker of Ms. Martinez's apartment to

see if someone would answer. Upon receiving no answer to their knocking, law enforcement

became more insistent and began loudly knocking on the front door and announcing their pres-

ence. The Defendant's mother and other occupants were awake, frightened, intimidated and con-

tinued to not answer the door.

Coercive law enforcement tactics to gain entry into the residence were then escalated

3

when law enforcement officers invaded the apartment's rear curtilage—at least four law en-
forcement officers entered onto and around the apartment's private patio and an agent began
knocking loudly on the apartment's back door and sliding glass window.  Police were loudly
knocking and announcing their presence for minutes,[2] and loudly knocking on the front and back
door simultaneously.  Nonetheless, for a time, the residents refused to answer—clearly indicating
that law enforcement was not welcome.

Ms. Martinez had several young children inside in the home.  She was panicked, fright-
ened and surrounded in her own home as law enforcement knocked on both sides of it.  Finally,
she approached the back door and drew aside the curtain.  An FBI agent, standing on her back
patio with other armed law enforcement officers around, showed her a paper through the glass
with the Defendant's picture on it—likely a wanted poster—and continued to "request" that she
open the door.  Ms. Martinez viewed the presentation of the document as an order and as legal
authority requiring her to allow law enforcement entry.  Feeling she had no other option, she
opened the door and allowed law enforcement inside.

As law enforcement entered her living room, Ms. Martinez sat on the couch with Special
Agent Fontanez, who began questioning her as to the whereabouts of the Defendant.  The agent
told Ms. Martinez that this was one of the hardest parts of his job and urged her to give up the
Defendant and not to deny that the Defendant was there.  One law enforcement officer, without
permission, walked through the open door and into Ms. Martinez's bedroom while this question-
ing took place.  Agent Fontanez asked Ms. Martinez why another bedroom door was closed.  Af-

---

[2] One resident reports that law enforcement knocked for approximately *five minutes*.

ter a few minutes, Ms. Martinez was crying, the situation was tense, and overcome by police pressure, Ms. Martinez told law enforcement that the Defendant was present in an apartment bathroom.

Law enforcement proceeded to arrest the Defendant in the bathroom, placing him in handcuffs.  As evidence of the tension in the home, as the Defendant was being escorted out, his younger sister approached and tried to hug him.  This resulted in a law enforcement officer drawing his firearm on her, which was witnessed by Ms. Martinez and small children (ages 3 through 8).  Defendant was subsequently transported to an FBI office in Washington, D.C. where he was interrogated and made inculpatory statements.

## LEGAL ANALYSIS

DEFENDANT WAS ARRESTED IN VIOLATION OF THE FOURTH AMENDMENT AND THE FRUITS OF THAT ARREST SHOULD BE SUPPRESSED.

A. Fourth Amendment Violations

Defendant was a guest in his mother's home at the time of his arrest and had a reasonable expectation to be free of unlawful government intrusion.   It is well established that the Fourth Amendment recognizes an overnight guest's right to the expectation of privacy in the home he visits.  See Minnesota v. Olson, 495 U.S. 91, 96-7 (1990) (stating "that Olson's status as an overnight guest is alone enough to show that he had an expectation of privacy in the home that society is prepared to recognize as reasonable.").  As such, Defendant has standing to raise a Fourth Amendment claim for being arrested in contravention of the Fourth Amendment in his mother's home.

While law enforcement conducted what they characterize as a "knock and talk," Defen-

dant asserts that the so-called "knock and talk" was not in any way the consensual encounter that the law enforcement reports purport to describe.  Rather, the law enforcement officers committed repeated Fourth Amendment violations to gain entry into Ms. Martinez's home.

At the outset, it is evident that Ms. Martinez did not want law enforcement inside her home, otherwise she would have answered the knock at her front door.  How long does a door have to go unanswered before it is obvious to the knocker that he is unwelcome?  Police are not permitted to linger forcefully knocking on the front door of a residence until they receive an answer:

> "[T]he knocker on the front door is treated as an invitation or license to attempt an entry, justifying ingress to the home by solicitors, hawkers and peddlers of all kinds." Breard v. Alexandria, 341 U.S. 622, 626, (1951).  This implicit license typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave. Complying with the terms of that traditional invitation does not require fine-grained legal knowledge; it is generally managed without incident by the Nation's Girl Scouts and trick-or-treaters.
>
> Thus, a police officer not armed with a warrant may approach a home and knock, precisely because that is "no more than any private citizen might do." Kentucky v. King, 563 U.S. ——, ——, 131 S.Ct. 1849, 1862 (2011).
>
> Florida v. Jardines, 569 U.S. at 8-9.

The persistent knocking and announcing by law enforcement violated the Fourth Amendment.  This violation became more egregious when law enforcement began knocking on Ms. Martinez's back door at the same time other agents were knocking on the front and still no one answered.

A further Fourth Amendment violation occurred when law enforcement committed a wrongful trespass by entering Ms. Martinez's back patio to knock on her back door.  The entry of

law enforcement into the curtilage to search for evidence of the Defendant's presence was in violation of the Fourth Amendment and alone requires suppression of all fruits from the Defendant's arrest.  In Florida v. Jardines, 569 U.S. 1 (2013), the Supreme Court recognized that the curtilage "area around the home is 'intimately linked to the home, both physically and psychologically,' and is where 'privacy expectations are most heightened.'" See Jardines 569 U.S. at 7.  The uninvited entry by several armed agents onto Ms. Martinez's back patio violated these heightened privacy expectations.  As the Supreme Court stated in Collins v. Virginia, "when a law enforcement officer physically intrudes on the curtilage to gather evidence, a search within the Fourth Amendment has occurred.  Such conduct thus is presumptively unreasonable absent a warrant." 138 S.Ct. 1663, 1670 (2018).

The entry onto the back patio also increased the pressure and coercion exerted upon Ms. Martinez, which ultimately caused her to open her door to the officers.  That is, the actions by law enforcement significantly escalated the "knock and talk" by blocking both points of entry/exit, and by prolonging and intensifying the officers' insistence to be granted entry by loudly knocking and announcing themselves at both the front and back doors.  The police conduct, as stated above, was not based on probable cause, and was executed through coercion.   The police officers' persistent knocking on the front door, and then knocking on both the front and back doors at the same time clearly violated the societal norms that "Girl Scouts and trick-or-treaters" generally manage.   This coercion obviated any consent on the part of Ms. Martinez for "[w]here there is coercion there cannot be consent."" Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973) (citing Bumper v. North Carolina, 391 U.S. 543 (1968)).

Further, the showing of an official looking piece of paper with her son's photo on it con-

fused Ms. Martinez into believing that law enforcement had the right to enter her home under color of law and that she had no right to refuse a search of her home. Bumper v. North Carolina, 391 U.S. 543, 548-49 (1968) ("When a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given. This burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority."). Lastly, within the apartment of itself, prior to Ms. Martinez telling law enforcement that her son was inside the home, a law enforcement officer entered her bedroom. This was clearly beyond the scope of any consent, implicit or explicit, provided to them and would communicate to any reasonable person that police were not leaving until they got what they wanted. United States v. Dichiarinte, 445 F.2d 126 (7th Cir., 1971) ( "[a] consent search is reasonable only if kept within the bounds of the actual consent.")(internal citation omitted).

## **CONCLUSION**

For all of these reasons, Defendant respectfully moves this Court to grant this motion. A proposed Order is attached hereto.

Respectfully submitted,

_____/s/_____
Joseph King
VSB # 65632
King, Campell & Poretz PLLC
108 N. Alfred Street, 2nd Floor
Alexandria, Virginia 22314
(703) 683-7070
Fax: (703) 652-6010
jking@kingcampbell.com

_____ /s/_____
Charles Russell Twist
VSB# 35483
Charles Russell Twist, PLC
2111 Wilson Boulevard, Suite 700
Arlington, Virginia 22201
703-812-8686
charlesrussell.twist@verizon.net

CERTIFICATE OF SERVICE

9

I hereby certify that a copy of the foregoing was filed via ECF and thereby forwarded to all counsel of record on this 18th day of November, 2019.

_____/s/_____
Joseph King
VSB# 65632
King, Campell & Poretz PLLC
108 N. Alfred Street, 2nd Floor
Alexandria, Virginia 22314
(703) 683-7070
Fax: (703) 652-6010
jking@kingcampbell.com

10