IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | **UNDER SEAL**[1] |
| v. ) | Criminal Action No. 1:18-cr-123-6 (RDA) |
| ) | |
| HENRY ZELAYA MARTINEZ, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on Defendant Henry Zelaya Martinez's ("Defendant") Motion to Suppress All Evidence Derived from Illegal Arrest of Defendant (Dkt. 357); Motion to Suppress Statements (Dkt. 334); and Motion to Suppress Evidence Seized from Search of Cellular Phone (Dkt. 302). Considering those Motions, the Government's Response in Opposition (Dkt. 414), Defendant's Notice of Supplemental Authority (Dkt. 388), oral argument and testimony at the hearing on the Motions, and the parties' supplemental briefs (Dkt. Nos. 844; 846; and 849), the Court DENIES Defendant's Motions for the reasons that follow.

### I. BACKGROUND

#### A. Procedural Background

On January 26, 2018, a sealed criminal complaint was filed against Co-defendant Oscar Contreras Aguilar, charging him with conspiracy to commit murder in aid of racketeering activity in violation of 18 U.S.C. § 1959(a)(5). Dkt. 1. Co-defendant Oscar Contreras Aguilar was then formally indicted on March 15, 2018. Dkt. 20. Then, on May 22, 2018, a sealed Superseding

---

[1] This Memorandum Opinion and Order is provisionally entered under seal. The parties are invited to file a brief statement setting forth the reasons for maintaining any part of this decision under seal within 30 days of the Court's ruling. If no party shows cause as to why sealing is warranted, this Memorandum Opinion and Order will be unsealed in its entirety.

1

Indictment was issued as to Defendant and ten other men. Dkt. 33. Defendant was charged with conspiracy to kidnap in violation of 18 U.S.C. § 1201(c). Nearly six months later, on November 18, 2018, Defendant was arrested at his mother's home in Alexandria, Virginia. Dkt. 124.

On November 29, 2018, Defendant was arraigned. Dkt. 134. A Second Superseding Indictment was issued on February 21, 2019, charging Defendant with two counts of conspiracy to commit kidnapping and murder in aid of racketeering activity in violation of 18 U.S.C. § 1959(a)(5); two counts of conspiracy to kidnap in violation of 18 U.S.C. § 1201(c); two counts of murder in aid of racketeering activity in violation of 18 U.S.C. §§ 1959(a)(1) and 2; and two counts of kidnapping resulting in death in violation of 18 U.S.C. §§ 1201(a)(1) and (2). Dkt. 162.

Defendant has filed three separate motions to suppress. One motion seeks to suppress all evidence derived from Defendant's arrest, which he alleges was unlawful. Dkt. 357. In the second Motion, Defendant seeks to suppress statements he made to law enforcement officers. Dkt. 334. In his third and final Motion, Defendant attempts to suppress evidence seized from the Government's search of his cell phone. Dkt. 302.

The Government filed a single Response in Opposition to Defendant's Motions. Dkt. 414. The Court held an evidentiary hearing on the three Motions to Suppress, which spanned approximately six hours. Dkt. 816. At the hearing, multiple witnesses testified on behalf of the Government, including Agent Christopher Pixton, Agent Carlos Fontanez ("Agent Fontanez" or "Fontanez"), and Megan Atkins. *See generally* Dkt. 851. The defense called Agent William Allen, John O'Donoghue, Jackie Ferrufino, Jenny Perez, and Erlinda Portillo-Martinez. *Id.* After the transcript of the hearing was completed and sent to the parties, the Court permitted the parties to file supplemental briefs and entered a briefing schedule. Dkt. 833. Defendant and the Government then timely submitted supplemental briefs. Dkt. Nos. 844; 846; and 849.

B. Factual Background

1. Defendant's November 18, 2018 Arrest

The Court finds that the following events occurred on November 18, 2018. Acting on information that Defendant was living at a home in Woodbridge, Virginia, law enforcement conducted an arrest operation at the Ivy League Court community in the early morning hours of November 18, 2018. Dkt. 851 (Transcript of February 23, 2021 Hearing ("Tr."), 16, 83). Law enforcement did not find Defendant at the Ivy League Court home, however. *Id.* at 17.

That same morning, officers also traveled to Alexandria, Virginia, where they arrived at an apartment complex on Derby Court that officers believed to be the home of Erlinda Portillo-Martinez, Defendant's mother. *Id.* at 91-92. Officers planned to conduct a "knock and talk" at the home in hopes of learning information about Defendant's whereabouts. *Id.* at 46. Defendant's mother lived in a ground-floor unit of a garden-style apartment complex, and her unit had a front entrance and a back entrance. *Id.* at 35. The back entrance opened onto a small patio; a green space separated the patio from an adjacent parking lot. *Id.* at 35, 47. In the course of their investigation, law enforcement had observed residents entering and exiting the unit through the back entrance's glass sliding doors. *Id.* at 47-48.

After Agent Fontanez knocked on this sliding door for approximately a minute, Defendant's mother met several officers at the door. *Id.* at 48, 100. Fontanez showed Defendant's mother his credentials and a photo of her son. *Id.* at 48. Fontanez then asked Defendant's mother if he could come inside and speak with her. *Id*. Defendant's mother agreed and invited him inside.

*Id.*² Fontanez testified that, for safety reasons, three other task force officers followed him into the apartment. *Id.* at 104.

Once inside, Defendant's mother sat down on a couch between the living room and kitchen, and Agent Fontanez sat down beside her. *Id.* at 50-51. Two children slept on a nearby mattress or pallet, and an older child sat on another couch in the living room. *Id.* at 51. The other agents who had entered the apartment with Fontanez stood at his side. *Id.*

Next, Agent Fontanez discussed Defendant and his whereabouts. *Id.* He told Defendant's mother that officers had an arrest warrant for her son, that they had been searching for him, and that he was wanted for his involvement in a violent crime. *Id.* at 51-52. Fontanez also told her that he knew she had recently communicated with her son and that it would be best for him to surrender. *Id.* at 52. After Agent Fontanez asked Defendant's mother to provide the phone number she had been using to contact her son, she began to cry. *Id.* Then, after she had become upset, Defendant's mother told Fontanez that her son was in the back of the house. *Id.* Surprised by this declaration, Fontanez looked at Defendant's mother, who then repeated—this time in a louder tone—"[h]e's in the back." *Id.*

Then, Agent Fontanez walked down a small hallway to the back of the apartment, his weapon drawn. *Id.* at 52-53. He was joined by two of his fellow officers, Agents Paul Fisher and Kini Freeman. *Id.* at 52. The officers noticed that the bathroom door stood slightly ajar, and they could see that Defendant was in the bathroom. *Id.* at 52-53. After Defendant exited the bathroom, officers placed him under arrest. Defendant cooperated as he was arrested. *Id.* at 53. Agent Fontanez next searched Defendant, finding his wallet, his cell phone, and a necklace. *Id.* at 54.

---

² Fontanez communicated with Defendant's mother in Spanish, his first language, and testified that he had no difficulty communicating with her. Dkt. 851 at 49.

2. Defendant's Post-Arrest Interview

After the arrest, officers brought Defendant to the FBI's Washington Field Office. *Id.* Agents Fontanez and Fisher ushered Defendant into a booking room, where he was left alone for a few minutes. *Id.* at 55. The room was equipped with video and audio recording capabilities, which remained activated for the duration of the Defendant's interview. *Id.* at 56. Fontanez then began asking Defendant a series of questions. From start to finish, Fontanez's questioning lasted at least an hour and forty minutes. *Id.* at 79.

First, Fontanez asked Defendant his name and date of birth. *Id.* at 63, 122. Then, Fontanez posed a number of other questions, asking Defendant about his contact information, education, language, where he was born, any known medical issues, and the names of any medications he takes—among other questions. *Id.* at 63. Fontanez also asked Defendant about his family, including his brother, Elmer Zelaya Martinez. *Id.* at 118. In addition to asking Defendant where he was from, Agent Fontanez asked which part of El Salvador he was from. *Id.* at 116. Fontanez then asked Defendant whether he came to the United States "la bestia or caminando"—that is, by train or walking. *Id.* Additionally, Fontanez inquired as to how long Defendant had lived in the United States and how long he had resided in Alexandria, Virginia. *Id.* at 119. Agent Fontanez also asked Defendant for the phone number of the cell phone that had been seized pursuant to his arrest. *Id.* at 64-65, 126. Defendant responded that he did not remember the number to that device; in response, Fontanez asked if the cell phone number would be stored in the phone itself. *Id.* at 65, 125-26. Defendant confirmed that the phone sitting on the interrogation room table would contain the device's phone number. *Id.* at 71.

After asking these questions, Fontanez told Defendant that he was subject to a federal arrest and that the officers wanted to speak with him. Dkt. 334 at 3. Fontanez then produced a copy of

the FBI's FD-395 form, a document the Bureau uses to advise those subject to custodial interrogation of their *Miranda* rights. Dkt. 851 at 66. The version of the form Fontanez provided to Defendant was in Spanish. *Id.* As Fontanez reviewed the form with Defendant, he asked whether Defendant understood what he was reading. *Id.* at 67. Defendant nodded in the affirmative as Fontanez reviewed the form with him. *Id.* Although Fontanez told Defendant to let him know if he had any questions, Defendant did not ask any questions or demonstrate that he was confused while Fontanez reviewed the *Miranda* form with him. *Id.*

Agent Fontanez then moved to the form's consent section, which he did not read aloud but showed Defendant. *Id.* The English translation of that portion of the form read: "I have read this statement of my rights and I understand them. I'm willing to answer questions at this time without the presence of a lawyer." *Id.* at 68. Fontanez told Defendant that he had already signed the form himself, that his partner would also sign the form as a witness, and showed Defendant where he could place his own signature. *Id.* Defendant reviewed the language, looked up at Fontanez, and, after a few moments, signed the form "H.J.Z.M." *Id.* at 68-69. Fontanez understood this signature to signify Defendant's full name, Henry de Jesus Zelaya Martinez.

After Defendant signed the form, Fontanez proceeded to question him. Defendant does not contend that he did not understand the agent's questions during the interrogation; he also did not ask to speak with a lawyer. *Id.* at 70. In the course of agents' questioning, Defendant admitted to his participation in one of the murders he has been charged with committing. *Id.* The agents showed Defendant a video and pictures of the victim and his murder. *Id.* Eventually, Fontanez told Defendant that he would be transported to a detention center in Alexandria, where Defendant would await his initial court appearance the next day. *Id.* at 71.

6

### 3. Defendant's Cell Phone

After Fontanez told Defendant that he would soon be brought to the Alexandria jail, Fontanez also told him that he would call Defendant's mother to inform her where her son would be detained. *Id.* Fontanez also told Defendant that he would likely be able to call his mother from jail himself. *Id.* To that end, Fontanez asked Defendant if he recalled his mother's phone number; Defendant answered that he did not. *Id.* at 71, 73. Fontanez then reached for Defendant's phone and asked whether Defendant's mother's phone number would be saved on the device. *Id.* at 73. Defendant replied in the affirmative, answering "yes." *Id.*

Next, Fontanez asked Defendant how to unlock the cell phone. *Id.* at 74. Defendant then took his phone—an Android cell phone—and used a pattern passcode to open the device. *Id.* at 74-75, 78. As he swiped his finger across the screen of the phone in a specific sequence, Defendant described the pattern as forming the shape of "a little house." *Id.* at 74. Defendant laughed as he shared this description, adding that it was simple enough for his young nieces to remember. *Id.* at 75. After Defendant unlocked the phone, he placed it in front of Fontanez. *Id.* Agent Fontanez then picked up the phone. *Id.* at 77.

After confirming the phone number of Defendant's mother could be found in the phone's contacts, Fontanez located her phone number in a contact entry titled "Madre." *Id.* at 75. Defendant affirmed that the phone number listed under that contact entry was indeed his mother's number. *Id.* Subsequently, Fontanez wrote the phone number on a scrap of paper, which he handed to Defendant. *Id.* Fontanez instructed Defendant to memorize the number, explaining that it was not certain he would be permitted to keep the piece of paper once he was in the custody of the United States Marshals Service. *Id.* at 75-76.

At that point, Fontanez returned to the subject of the phone number for Defendant's own cell phone. *Id.* at 77. Fontanez was unable to find the phone number at the top of the contacts list, where he expected it might be listed, and so he asked Defendant where the device's phone number could be found. *Id.* at 77-78. Defendant then looked through a contact list and showed Fontanez the number connected to the cell phone. *Id.* at 78. Fontanez transcribed the number in his notes and powered off the phone. *Id.*

Fontanez later obtained a search warrant to search the device, turned the phone over to FBI forensic examiners, and requested that experts perform an extraction. *Id.* at 134-36. Upon request from an FBI agent responsible for the extraction, Fontanez provided the passcode to access the device. *Id.* at 136-37.

## II. ANALYSIS

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures[.]" U.S. Const. amend. IV. "The Fourth Amendment imposes limits on search-and-seizure powers in order to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals." *United States v. Martinez-Fuerte*, 428 U.S. 543, 554 (1976).

The Fifth Amendment provides that "[n]o person. . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. In *Miranda v. Arizona*, 384 U.S. 436 (1966), "the Supreme Court afforded protection to the Fifth Amendment privilege against compelled self-incrimination 'from the coercive pressures that can be brought to bear upon a suspect in the context of custodial interrogation.'" *United States v. Blake*, 571 F.3d 331, 338 (4th Cir. 2009) (quoting *Berkemer v. McCarty*, 468 U.S. 420, 428 (1984)). It is axiomatic that "before a suspect in custody can be interrogated, the suspect 'must be warned that he has a right to remain

8

silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney.'" *United States v. Haynes*, 26 F. App'x 123, 132 (4th Cir. 2001) (quoting *Miranda*, 384 U.S. at 444).

An individual's right to an attorney includes the right to consult with an attorney prior to questioning and the right to have an attorney present during interrogation. *United States v. Nash*, 739 F. App'x 762, 764 (4th Cir. 2018). Generally, statements "elicited from a suspect in violation of these rules are inadmissible in the [G]overnment's case-in-chief." *Haynes*, 26 F. App'x at 132 (citing *Stansbury v. California*, 511 U.S. 318, 322 (1994)).

A. Motion to Suppress All Evidence Derived from Illegal Arrest

Defendant's first Motion seeks to exclude "all evidence flowing from his arrest," which he argues violated the Fourth Amendment. Dkt. 357 at 1. While it is undisputed that the Fourth Amendment generally prohibits law enforcement officers from entering a private home when they lack a warrant, *see Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990), it is equally clear that "[t]he prohibition does not apply [] to situations in which voluntary consent has been obtained[.]" *Id.* Consent may be obtained "either from the individual whose property is searched" or from a third party who exercises common authority over the property. *Id.* Whether a particular consent to search is voluntary—as opposed to "being the product of duress or coercion, express or implied," *United States v. Azua-Rinconada*, 914 F.3d 319, 324 (4th Cir. 2019)—is a factual determination, which must be evaluated by looking to "the totality of all the circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973).

Under the "knock-and-talk exception to the Fourth Amendment's warrant requirement," "a police officer not armed with a warrant may approach a home and knock, precisely because that is 'no more than any private citizen might do.'" *Covey v. Assessor of Ohio Cty.*, 777 F.3d 186, 192

9

(4th Cir. 2015) (quoting *Florida v. Jardines*, 569 U.S. 1, 8 (2013)) (internal citation omitted). In a knock-and-talk generally, "there is an "implicit license . . . to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." *Id.* at 1415. That is what happened this case, except that when the officers approached the Derby Court home's primary entrance used by apartment-dwellers, they were approaching the "back" entrance. Mail and other deliveries were apparently made to the other entrance. Dkt. 347 at 3.

While *Jardines* instructs that the curtilage is "intimately linked to the home," 569 U.S. at 7, the constitutionality of a knock-and-talk does not turn whether it is conducted at the front door or some other entrance. The Fourth Circuit has eschewed such a rigid distinction on several occasions. In *Covey*, the Fourth Circuit stated that "[a]n officer may also bypass the front door (or another entry point usually used by visitors) when circumstances reasonably indicate that the officer might find the homeowner elsewhere on the property." 777 F.3d at 192-93. And in *Alvarez v. Montgomery Cty.*, 147 F.3d 354, 358 (4th Cir. 1998), the Fourth Circuit noted that many courts "likewise have found that the Fourth Amendment does not invariably forbid an officer's warrantless entry into the area surrounding a residential dwelling even when the officer has not first knocked at the front door." *Id.* (collecting cases).[3]

The officers' reasonable belief the patio entrance was the "proper entrance" is supported by the record. Although Defendant relies heavily on the fact that officers approached the apartment's "back" patio entrance rather than the entrance formally designated as the "front"

---

[3] The district court in *United States v. Jones*, No. 4:13-cr-11-003, 2013 WL 4678229, at *7 (W.D. Va. Aug. 30, 2013) reached the same conclusion when it observed that "[t]he 'knock-and-talk' rule permits officers to seek entrance at what they reasonably believe to be the "proper entrance" to the home, or where they reasonably believe the homeowner may be found."

10

entrance, that fact does not transform the officers' activity into a Fourth Amendment violation. Defendant's mother lived in a ground-floor, garden-style apartment. Dkt. 851 at 18. The back entrance to her unit consisted of a sliding glass door that opened onto a grassy expanse, with no walls or fencing around the small patio area. *Id.* at 19. The entrance was visible and easily accessible from where the agents had parked—nothing impeded any visitor from parking a car and proceeding directly to the home across either the greenspace or by following a cement path. *Id.* at 20. Significantly, the back patio entrance was also the one that the unit's residents used to enter and exit the apartment, which officers had observed. *Id.* at 47-48.

Defendant casts the officers' presence on his mother's patio as a "wrongful trespass" on the curtilage of the unit. Dkt. 357 at 6. It is well established that "when a law enforcement officer physically intrudes on the curtilage to gather evidence, a search within the Fourth Amendment has occurred." *Collins v. Virginia*, 138 S. Ct. 1663, 1670 (2018) (observing that "[s]uch conduct" is "presumptively unreasonable absent a warrant"). But no such evidence-seeking intrusion occurred here. Police officers believed they would find Defendant at the Ivy Court apartment complex in Woodbridge, Virginia early in the morning of November 18, 2018. Dkt. 851 at 16-17. The officers did not, in fact, find him there. *Id.* at 17.[4] Several agents then proceeded to the Alexandria, Virginia home of Defendant's mother, where another officer was already conducting surveillance, in hopes that she might be willing to provide information about her son's whereabouts. *Id.* Officers approached the home with that purpose; they did not approach the home "to explore the

---

[4] Generally, a defendant "does not have standing to vicariously assert a Fourth Amendment violation committed against a third person or persons." *Rakas v. Illinois*, 439 U.S. 128, 133 (1978). Seeing no reason to depart from that general principle here, the Court rejects Defendant's invitation to engage in factfinding regarding an alleged intentional rights violation by law enforcement against any other persons. Therefore, the Court does not draw any inferences from such factfinding that might bear on the testimony of Agent Fontanez.

area in hopes of discovering incriminating evidence," *Jardines*, 569 U.S. at 9, thereby acting within the permissible bounds of the knock-and-talk rule. Agent Fontanez himself admitted as much when he stated that "[t]his was not a conventional arrest operation" and that they lacked tactical gear. Dkt. 851 at 46. Instead, officers wore plain clothes and simply hoped to conduct a knock-and-talk at the home of Defendant's mother.

Viewing "the totality of all the circumstances" in this case, *Schneckloth*, 412 U.S. at 227, the Court does not find that Ms. Portillo consented to a search of her home in the face of duress or coercion. Defendant argues that officers "confused [her] into believing . . . that she had no right to refuse a search of her home," Dkt. 357 at 6-8, but that assertion is unsupported by the factual record. Agent Fontanez displayed his FBI credentials and asked her, in Spanish, if he could speak with her about her son. Dkt. 851 at 48-49. He showed Ms. Portillo a photo of her son but never showed her a wanted poster or a warrant, and no officer had his weapon drawn or otherwise displayed. *Id.* at 48-50. Then, Ms. Portillo invited Fontanez to enter the home. *Id.* at 104. And even if she were unaware that she was not required to provide the officers entry, the search was still lawful because "knowledge of a right to refuse is not a prerequisite of a voluntary consent[.]" *Schneckloth*, 412 U.S. at 234.

This Court has considered Ms. Portillo's oral testimony and demeanor at the suppression hearing and does not find that her responses, to the extent they contradict the facts as articulated above, establish that the officers applied coercion or duress to search her home. In particular, Ms. Portillo's representations on direct examination that she saw and heard officers at both entrances to the home and that she saw the officers' weapons through the door and therefore felt compelled to open the door—statements she later contradicted on cross-examination—demonstrate that much of her oral testimony is not credible. *See* Dkt. 851 at 208, 211. Neither are Ms. Portillo's

12

statements that she felt obliged to disclose her son's whereabouts to protect her daughter from adverse immigration consequences credible, as officers specifically noted they were not immigration authorities and did not discuss immigration matters with Ms. Portillo. *See id.* at 106, 209.

There are other reasons to discount Ms. Portillo's testimony. For instance, she denied knowing that Defendant Henry Zelaya Martinez was wanted in connection with the crimes charged. *Id.* at 214. But this assertion is directly contradicted by her own communications with Defendant in which she instructed him about which entrance to use when he visited her in Alexandria, presumably to warn him to avoid being caught by "a camera in front." *Id.* at 219. Furthermore, if Ms. Portillo's testimony that officers were so intent on raiding the home that they knocked loudly for five minutes before she came to the door were true, *id.* at 206, it would stand to reason that such strongarming officers might have immediately located her son in the small apartment upon entering the home. Instead, Ms. Portillo testified that Agent Fontanez sat on a living room couch and spoke with her for ten minutes before she divulged her son's hiding place. *Id.* at 209. This Court finds that Ms. Portillo freely and voluntarily consented to the search.

In sum, Defendant's arrest comported with the Fourth Amendment's requirements, and there is no basis to suppress the evidence flowing from that arrest.

### B. Motion to Suppress Statements

A suspect is "in custody" for purposes of *Miranda* if he has been "arrested or if his freedom of action has been curtailed to a degree associated with arrest." *Burket v. Angelone*, 208 F.3d 172, 197 (4th Cir. 2000*)* (citing *Stansbury*, 511 U.S. at 322). Additionally, an "interrogation' within the scope of *Miranda* refers not only to express questioning, but also to its "functional equivalent,"

*Rhode Island v. Innis*, 446 U.S. 291, 301 (1980), meaning "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* An "incriminating response" refers to "any response—whether inculpatory or exculpatory—that the prosecution may seek to introduce at trial." *United States v. Guess*, 756 F. Supp. 2d 730, 737 (E.D. Va. 2010) (quoting *Innis*, 446 U.S. at 302 n.5).

### 1. Pre-*Miranda* Statements

First, Defendant's Motion to Suppress Statements is moot to the extent he seeks to suppress pre-*Miranda* questions, as the Government has committed that the prosecution "does not intend to introduce in its case-in-chief any of Zelaya's answers to the biographical questions that were asked before he was Mirandized." Dkt. 844 at 8. Based on this representation, the Court denies this part of the Motion as moot and, at trial, will hold the Government to its assurance that none of Defendant's pre-*Miranda* answers to biographical questions will be introduced in the Government's case-in-chief.

Even so, it must be acknowledged that "certain questions asked for the purpose of booking a suspect who has been arrested are exempt from *Miranda*'s coverage, and the answers are thus admissible even if no *Miranda* warnings have been given." *Guess*, 756 F. Supp. 2d at 740 (citing *Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990) (holding that a "routine booking exception exists" to *Miranda*)). These booking questions include an individual's "name, nickname, race, sex, age, marital status, height, weight, complexion, address, social security number, parents' names, and education," as well as "questions securing 'biographical data necessary to complete booking or pretrial services.'" *Id.* (citing *United States v. Fenner*, No. 93- 5955, 1994 WL 637257, at *1-2 (4th Cir. Nov. 15, 1994) and quoting *United States v. D'Anjou*, 16 F.3d 604, 608 (4th Cir.

14

1994)). Having reviewed the record, including the immigration-related questions to which Defendant objects, this Court discerns no deviation from the booking-question exemption. Agent Fontanez's questions regarding when and how Defendant came to the United States were requests for "standard background information" such as an arrestee's "name, citizenship, place of birth, address, and length of time in [his city of residence]." *D'Anjou*, 16 F.3d at 608. Accordingly, the Court will not order suppression of Defendant's pre-*Miranda* statements, although the Government may not introduce those statements during its case-in-chief.

### 2. Post-*Miranda* Statements

Defendant waived his *Miranda* rights and subsequently gave an incriminating statement to Agent Fontanez, which he also seeks to suppress. Defendant argues this statement must be suppressed because his *Miranda* waiver was not knowing, intelligent, and voluntary. *See* Dkt. 334 at 6-9. After reviewing the facts in the record, considering oral testimony, and observing a video of Defendant giving the disputed waiver—which was presented as evidence at the suppression hearing—the Court denies Defendant's motion insofar as it seeks to suppress his post-*Miranda* statements to law enforcement.

A criminal defendant may waive his rights under *Miranda* so long as a two-dimensional inquiry is satisfied. *See Edwards v. Arizona*, 451 U.S. 477, 482 (1981). First, the waiver must be made "voluntarily, knowingly and intelligently.'" *United States v. Hunter*, 63 F. Supp. 3d 614, 620 (E.D. Va. 2014) (quoting *Miranda*, 384 U.S. at 444). Second, the waiver must be made "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). "Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite

15

level of comprehension may a court properly conclude that the Miranda rights have been waived.'" *Id.* (quoting *Fare v. Michael C.*, 442 U.S. 707, 725 (1979)).

The Government must prove by a preponderance of the evidence that Defendant's waiver was voluntary as well as knowing and intelligent. *See United States v. Robinson*, 404 F.3d 850, 860 (4th Cir. 2005). In this case, the Government has satisfied its burden. The Court observed a recording of the interrogation and finds that Defendant appreciated the serious nature of his exchange with Agent Fontanez. He spoke with Fontanez in his native language, listened attentively as Fontanez read him his *Miranda* rights, was given sufficient time to review the *Miranda* waiver form, and had a chance to ask Fontanez questions. Then, Defendant decided to sign the form, waive his rights, and speak with the law enforcement about the crimes he is alleged to have committed.

Furthermore, there is no basis for concluding that the waiver was procured through intimidation, coercion, or deception. When determining whether a waiver is voluntary, the critical inquiry is "'whether the defendant's will has been 'overborne' or his capacity for self-determination crucially impaired.'" *United States v. Bello-Murillo*, 62 F. Supp. 3d 488, 495 (E.D. Va. 2014) (quoting *Cristobal*, 293 F.3d at 140). The Court considers "the characteristics of the defendant, the setting of the interview, and the details of the interrogation." *Id.* First, the Court looks to Defendant's characteristics. Although Defendant was unfamiliar with the legal system and English is not his native tongue, Fontanez explained to Defendant what was happening in layman's terms in his native language. Next, the Court evaluates the setting of the interview and details of the interview. Fontanez advised Defendant of his *Miranda* rights and, as Fontanez read him reach right, Defendant nodded along and said, "um hmm." After Fontanez finished reading, he looked at Zelaya and asked, "[d]id you understand them all?" Defendant nodded affirmatively.

In this case, there is no evidence that Defendant's will was overborne by mental or physical coercion.

Turning to the knowing and intelligent component of the analysis, a court "must examine 'the suspect's intelligence and education, age and familiarity with the criminal justice system, [and] the proximity of the waiver to the giving of *Miranda* warnings.'" *Bello-Murillo*, 62 F. Supp. 3d at 496 (quoting *Correll v. Thompson*, 63 F.3d 1279, 1288 (4th Cir. 1995)). While the defense's Motion references Defendant's "significant intellectual impairment," little schooling, and lack of "familiarity with the American legal process," Dkt. 334 at 8-9, Defendant's representations regarding his low intellectual capacity are too insubstantial to justify suppressing his statements. The video of the exchange, which this Court observed, does not reveal that Defendant struggled to understand Fontanez or the gravity of the moment. He did not appear confused when Agent Fontanez explained the interrogation process to him or when he was advised of his *Miranda* rights. Dkt. 851 at 66-67. When Defendant stated that he had never been arrested before, Fontanez explained that he enjoyed certain rights during custodial interrogation, which he then read aloud to Defendant. *Id.* at 65-67.

This Court finds that when Defendant waived his *Miranda* rights, his decision to do so was the product of a "free and deliberate choice rather than intimidation, coercion, or deception." *Moran*, 475 U.S. at 421. And even if this affirmative waiver were somehow defective, Defendant impliedly waived his *Miranda* rights when he demonstrated a "subsequent willingness to answer questions after acknowledging [his] *Miranda* rights," which constitutes an implied waiver. *United States v. Frankson*, 83 F.3d 79, 82 (4th Cir. 1996). Consistent with these findings, the Court declines to grant Defendant's suppression motion with respect to his post-*Miranda* statements.

C. Motion to Suppress Evidence Seized from Search of Cellular Phone

Defendant also moves to suppress evidence seized from the search of his cell phone, arguing Agent Fontanez's allegedly illegal trespass into his cell phone "facilitated" and "irremediably taints" the subsequent search of the phone's contents, which were obtained through a warrant. Dkt. 302 at 5. In Defendant's telling, when Fontanez unlawfully obtained and confirmed the passcode, he violated the Fourth Amendment.[5] Hence, Defendant argues, Agent Fontanez's disclosure of the passcode to an expert who performed the extraction of the phone via warrant "cannot cure the previous illegal intrusion of the phone because" the FBI extraction was the fruit of the initial unlawful search under *Wong Sun v. United States*, 371 U.S. 471 (1963).

Having consented to two searches of his phone, Defendant cannot convincingly argue that the searches were conducted in violation of the Fourth Amendment. Defendant grants that he acquiesced to the first search Fontanez conducted when he unlocked the phone for the agent and revealed the passcode so that Fontanez could retrieve his mother's phone number. Dkt. 302 at 5. As for the second search, Defendant contends that when Fontanez accessed the phone a second time and confirmed the passcode was correct, this search resulted in an unlawful intrusion into the phone's contents. *See id.* But this argument is unpersuasive, as Defendant orally verified the shape of the pattern lock and looked on approvingly as Fontanez navigated to the contacts to determine the number associated with the phone. *See United States v. Hylton*, 349 F.3d 781, 786 (4th Cir. 2003) ("Consent may be inferred from actions as well as words."). The Motion alleges "subterfuge" on the part of law enforcement, but this is not a case in which police lied to obtain voluntary consent by either misrepresenting a claim of court-sanctioned authority to search or

---

[5] Defendant initially moved to suppress evidence obtained from the cell phone on Fifth Amendment grounds as well, but he later acknowledged this argument was foreclosed by the Fourth Circuit's decision in *United States v. Oloyede*, 933 F.3d 302, 312 (4th Cir. 2019). Dkt. 388.

claiming there were exigent circumstances. *Cf. Pagan-Gonzalez v. Moreno*, 919 F.3d 582, 592 (1st Cir. 2019) (holding that a consensual search may be invalid where law enforcement engages in deceit regarding nature or scope of the investigation to obtain consent for search).

Were the cell phone searches nonconsensual, this Court would still deny the motion to suppress. Evidence obtained through an otherwise impermissible search may not be excluded when the prosecution demonstrates, under the inevitable discovery doctrine, "that police legally could have uncovered the evidence; and second, that police would have done so." *United States v. Alston*, 941 F.3d 132, 138 (4th Cir. 2019). The Government has met its burden here. When an FBI forensic examiner extracted data from the phone, she used a universal forensic extraction device. Therefore, even if Fontanez had not provided the FBI with the passcode to Defendant's cell phone, investigators would have nevertheless used software existing at that time to unlock the phone, probe its contents, and extract relevant data from the device. Because the Government has demonstrated this likelihood by a preponderance of the evidence, *see Nix v. Williams*, 467 U.S. 431, 444 (1984), this Court denies the motion even assuming Defendant did not give his consent to the searches of his cell phone.

## IV. CONCLUSION

For these reasons, it is hereby ORDERED that Defendant's Motions to Suppress (Dkt Nos. 302; 334; and 357) are DENIED; and it is

FURTHER ORDERED that this Memorandum Opinion and Order shall remain under seal until further order of the Court. The parties are invited to file a brief statement setting forth the reasons for maintaining any portion of this decision under seal within 30 days of the entry of this Memorandum Opinion and Order. If no party shows cause as to why sealing is warranted, this Memorandum Opinion and Order will be unsealed in its entirety.

The Clerk is directed to send copies of this Order to counsel for Mr. Henry Zelaya Martinez and the Government.

It is SO ORDERED.

Alexandria, Virginia
October 19, 2021

/s/
Rossie D. Alston, Jr.
United States District Judge